

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

---

AB:RJN
F#. 2009R01167

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 13, 2010

By Fax and ECF

The Honorable Robert M. Levy
United States Magistrate Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

            Re:  United States v. Joseph Lubrano
                 Criminal Docket No. 10 CR 0010 (ENV)

Dear Judge Levy:

        The government respectfully submits this letter in
support of its application to remand Joseph Lubrano, who is
scheduled to be arraigned before Your Honor later today.  As
described below, this individual has been a fugitive from justice
since May 18, 2010.  He poses a flight risk and a danger to the
community, and thus should be detained pending trial.

        The defendant Joseph Lubrano is a captain of the
Luchese organized crime family of La Cosa Nostra ("LCN").  He
supervised a crew of individuals who engaged in multiple armed
robberies in which victims were routinely followed to their
homes, beaten, restrained with zip ties and threatened with guns
and other weapons.

## I.   Superseding Indictment and Investigation

### A.   The Investigation

        The superseding indictment returned in this matter is
the result of an investigation by the Federal Bureau of
Investigation ("FBI") of members and associates of the Bonanno
and Luchese organized crime families of La Cosa Nostra operating
in the Eastern District of New York.  The investigation is based
in part on information provided by two cooperating witnesses
("CW1" and "CW2").  The FBI investigation is the latest in a
series of investigations of La Cosa Nostra prosecuted by this

Office.  In those investigations, members and associates of La Cosa Nostra have agreed to cooperate with the government, including high-ranking members of the Bonanno, Colombo, Gambino and Luchese organized crime families.  These cooperating witnesses have advised that the Luchese family exists and that it is a part of a violent criminal enterprise that engages in egregious criminal acts, including murder and assault, and crimes intended to obstruct justice.  Brief overviews of the new charges set forth in the superseding indictment are detailed below.

    B.   <u>Superseding Indictment</u>

On May 13, 2010, a grand jury sitting in the Eastern District of New York returned a thirty-two count superseding indictment (S-4) charging various crimes against eleven defendants.  Most relevant for the purposes of this detention memorandum, Joseph Lubrano is charged in Counts One and Two of the superseding indictment with racketeering and racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(c) and 1962(d).  Specifically, Lubrano was charged in two racketeering acts with participating, along with Salvatore Cutaia and Joseph Cutaia, in conspiracy to commit armed robbery.

The superseding indictment also charges Joseph Cutaia, Salvatore Cutaia, Salvatore Cutaia, Jr., Anthony Cutaia and Anthony Manzella with other crimes of violence, including armed robberies, the unlawful use of a firearm, in connection with these robberies and the extortionate collection of credit.[1] Joseph Cutaia, Salvatore Cutaia and Anthony Manzella are all detained pending trial.[2]

---

[1]    Manzella is currently incarcerated pending trial in the matter of <u>United States v. Onofrio Modica, et al.</u>, 09 CR 01243 (LAK) in the Southern District of New York.  Should Manzella be released pending trial in that case, the government intends to seek his detention pursuant to his indictment in the Eastern District of New York.  Salvatore Cutaia is currently incarcerated for his conviction in <u>United States v. Domenico Cutaia, et al</u>., 08-0098 (BMC).  Salvatore Cutaia, Jr. and Anthony Cutaia have each been released on substantial bond after their arrest on May 18, 2010.

[2]    The pretrial status of the other defendants named in the indictment has also been previously adjudicated pursuant to the prior indictment in this case.  Like Salvatore Cutaia, Domenico Cutaia is currently incarcerated for his conviction in <u>United States v. Domenico Cutaia, et al.</u>  Anthony Mannone and

## II.  **Legal Standard**

### A.  The Bail Reform Act

Under the Bail Reform Act, Title 18, United States Code, Sections 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.  A finding of risk of flight must be supported by a preponderance of the evidence.  See United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).

### B.  Organized Crime Defendants

District courts in this Circuit routinely have faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses.  See, e.g., United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. DeFede, 7 F. Supp. 2d 390, 395 (S.D.N.Y. 1998) (Luchese family acting boss Joseph DeFede detained as danger to the community); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); United States v. Salerno, 631 F. Supp. 1364,

---

Carlo Profeta are also detained pending trial in this matter. Jerome Caramelli and Eric Maione have been released on bond, and because the superseding indictment does not contain any additional charges against them, the government does not seek their remand at this time.

1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community).

Together, these cases stand for the following propositions: (1) leaders of a violent organized criminal enterprise inherently are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

1.    Organized Crime Leaders Are Dangers
      to the Community

Pretrial detention is warranted where defendants, charged with violent crimes, are high-ranking members of a criminal organization whose activities routinely include violence and threats of violence. See Ciccone, 312 F.3d at 543; United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996). For example, in United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987), in ordering the detention of two leaders of the Genovese family, the district court observed that:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

Salerno, 631 F. Supp. at 1375.

Similarly, in Defede, 7 F. Supp. 2d at 391, the defendant, Joseph Defede, was charged with extortion and extortion conspiracy. The district court ordered Defede's pretrial detention, finding that the government had shown by

4

clear and convincing evidence that Defede was the acting boss of
the Luchese family, thus rendering him a danger to public safety:

> The acting boss of the Luchese family
> supervises all of its far-flung criminal
> activities, including acts of violence.
> Defede's continued liberty therefore presents
> a substantial danger to the public.

Id. at 395.  Indeed, the Second Circuit has upheld the detention
of organized crime defendants because "their continued liberty
presents a risk to the public not only from their own violent
activities but from those of subordinates whom they supervise."
United States v. Cirillo, 149 Fed. Appx. 40 (2d Cir. 2005)
(summarily affirming the decision of Magistrate Judge Robert M.
Levy to detain the acting boss and former acting boss of the
Genovese family.)

      In addition, to be detained as a danger to the
community, an organized crime defendant need not be charged in
specific predicate acts of violence; position in a violent
organization itself is proof of danger.  Ciccone, 312 F.3d at
542-43; see also United States v. Ferranti, 66 F.3d 540, 543 (2d
Cir. 1995) (noting that the defendant need not have committed the
violence himself, he can be deemed dangerous if he directed
others to commit acts of violence) (citing Colombo, 777 F.2d at
98).  As one court has observed, an organized crime leader "is
dangerous because inherent in the leadership position is the
supervision of criminal activity that cannot be curtailed by any
condition or combination of conditions of release."  Gotti, 219
F. Supp. 2d at 299-300 (citations omitted).

      To be sure, courts' decisions to deny bail to organized
crime leaders have not been based solely on the defendants' mere
"association" with organized crime, but rather on the evidence
that members of organized crime, and in particular, high-ranking
members of organized crime, routinely engage in acts of violence
as a result of their position in a criminal enterprise.  As the
court held in Defede, 7 F. Supp. 2d at 392:

> it is well established that persons who hold
> Defede's status routinely engage in conduct
> that is a menace to public safety.  The
> argument thus is based not on the status, but
> on the inference that a person in Defede's
> position is quite likely to engage in
> dangerous conduct – just as one reasonably
> could infer that one holding the position of

5

major league baseball pitcher is entirely
likely to hurl a small white object in the
direction of home plate.

Moreover, in enacting the Bail Reform Act, Congress
itself recognized that high-ranking members of an organized crime
family fall within the "small but identifiable group of
particularly dangerous defendants as to whom neither the
imposition of stringent release conditions nor the prospect of
revocation of release can reasonably assure the safety of the
community."  S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as
reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate
Report"), 3188-89.

Nor is the above caselaw narrowly limited to organized
crime "bosses" or "acting bosses."  In United States v. Salerno,
631 F. Supp. at 1374-75, the court held that a defendant would be
a danger to the community if released on bail based on evidence
that he was a captain in an organized crime family who managed
the enforcement operations of the enterprise.  In Colombo, 777
F.2d at 99, a captain of a crew in the Colombo family was ordered
detained because the operation of that organization posed a "risk
to the public" and a "danger to the community" by its "consistent
pattern of orchestrating a series of violent criminal
operations."

> 2.    Organized Crime Defendants Are Likely to
>        Commit Crimes if Released on Bail

Organized crime defendants pose a particular threat to
the community due to the continuing nature of the charged
enterprise and its violent criminal activities.  At bottom,
because organized crime defendants are career criminals who
belong to an illegal enterprise, they pose a distinct threat to
commit additional crimes if released on bail.  See Salerno, 631
F. Supp. at 1375 (finding that the illegal businesses of
organized crime require constant attention and protection, and
recognizing a strong incentive on the part of its leadership to
continue business as usual).

Congress noted that defendants pose a danger to the
community not only when they commit acts of violence, but when it
is likely that they will commit even non-violent crimes that are
detrimental to the community.  See Senate Report at 3195
("language referring to safety of the community refers to the
danger that the defendant might engage in criminal activity to
the detriment of the community . . . . The Committee intends that
the concern about safety be given a broader construction than

merely danger of harm involving physical violence"). In <u>Salerno</u>, 631 F. Supp. at 1371, the court held:

> In light of Congress' direction that '[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate' . . . .

<u>See also</u> <u>United States v. Colombo</u>, 777 F.2d 96, 99 (2d Cir. 1985). Ultimately, the court in <u>Salerno</u> detained two leaders of the Genovese organized crime family, noting:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

631 F. Supp. at 1375.

> 3. Elaborate Bail Packages Are Insufficient to Protect the Community Against Violent <u>Organized Crime Defendants</u>

Finally, the Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants, including leaders of organized crime families shown to be involved in violent criminal activities. <u>See</u> <u>United States v. Dono</u>, Nos. 07-5333-cr(L), 07-5334-cr(CON), 2008 WL 1813237, at *2-3 (2d Cir. April 23, 2008) (rejecting conditions that included, among others, home detention and electronic monitoring, and a requirement that the defendant's father – a retired police officer – take "personal responsibility" for the defendant); <u>Ferranti</u>, 66 F.3d at 543-44 (rejecting $1 million bail secured by real property); <u>United States v. Orena</u>, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail secured with real property, in-home detention, restricted visitation and telephone calls and electronic monitoring); <u>Colombo</u>, 777 F.2d at 97, 100 (rejecting

$500,000 bail secured with real property).

The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals. In <u>United States v. Millan</u>, 4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted), the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

<u>See</u> <u>also</u> <u>Orena</u>, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  <u>See</u>, <u>e.g.</u>, <u>Dono</u>, 2008 WL 1813237, at *2-3 (noting that the idea that "'specified conditions of bail protect the public more than detention is flawed'") (quoting <u>Orena</u>, 986 F.2d at 632); <u>United States v. Cantarella</u>, 2002 WL 31946862, *3-4 (E.D.N.Y. 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); <u>Agnello</u>, 101 F. Supp. 2d at 116 ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); <u>United States v. Masotto</u>, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

III. **The Defendant Should Be Detained**

> The government proffers the following facts concerning the charges, the defendant and the need for the pretrial detention of Lubrano. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (the government is entitled to proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

A.    Joseph Lubrano Poses a Danger to the Community

> Joseph Lubrano should be detained as he presents a danger to the community and is a risk of flight.  According to CW1 and CW2, Joseph Lubrano is a captain in the Luchese family and supervised a crew of individuals, including CW1, CW2, Joseph Cutaia, Salvatore Cutaia, Jr. and Anthony Cutaia, who participated in violent, armed robberies on at least a weekly basis.  After completing the robberies, CW1 and Joseph Cutaia routinely met with Lubrano at Lubrano's social club in the Bronx to provide Lubrano with his share of the robbery proceeds. In exchange, Lubrano provided protection to Joseph Cutaia and his criminal associates and pledged to support Joseph Cutaia's bid to become a made member of the Luchese family.[3]

> The crew that Lubrano supervised was particularly violent.  They restrained their victims with zip ties and frequently beat them in order to ensure their cooperation.  They used guns to threaten, pistol whip and, on occasion, shoot their robbery victims.  For example, during the robbery charged against Lubrano in Racketeering Act Ten, Lubrano's crew assaulted two individuals, one of whom was believed to be involved in large-scale marijuana trafficking, threatened the victims with guns and a knife and zip tied one of the victims and his girlfriend.

> After committing this robbery, Cutaia and CW1 discussed this and other robberies with Lubrano and provided him a cut of the proceeds.  Lubrano expressed his appreciation of CW1 and offered to provide his assistance should CW1 have difficulties with any other members or associates involved in organized crime. He also suggested that he could help CW1 become a made member of the Luchese crime family.  Lubrano also assisted Joseph Cutaia. For example, when CW1, CW2 and Joseph Cutaia robbed another individual connected to the Bonnano organized crime family,

---

[3]    The information provided by CW1 and CW2 is corroborated by other confidential sources.

Joseph Cutaia's life was threatened and Lubrano protected him from retaliaion.

During the robbery charged against Lubrano in Racketeering Act Eleven, Joseph Cutaia and the other coconspirators restrained the victim in his bedroom and threatened him with a gun and a knife as they ransacked the house for money.  In the midst of the robbery, the victim's wife returned home.  The assailants threatened to kill her husband in an effort to force her to locate more money.

In certain instances, Lubrano was also responsible for directing members of his crew to particular victims.  For instance, Lubrano provided Joseph Cutaia and the cooperating witnesses with information about drug dealers in Queens, New York.  During an attempt to rob these drug dealers, the victims were tied and pistol whipped.

Lubrano's crew committed egregious acts of violence in other robberies they committed.  For example, in one robbery committed by Joseph Cutaia and others (charged in Counts Thirty and Thirty-One of the superseding indictment), the victim was shot in the knee.  Joseph Cutaia then threatened to kill the victim if he reported the incident to the police, and Cutaia later bragged about the shooting in an effort to instill fear in another one of his associates.  In another robbery (charged in Racketeering Act Twelve and Counts Twenty-Seven and Twenty-Eight of the superseding indictment) the victim, an owner of an eletronics store, was beaten inside of his car.  When he managed to escape from the car and run towards his wife who had come out of their house, gun shots were fired at him and his wife.  In yet another robbery (charged in Count Twenty-Six), Joseph Cutaia and his coconspirators tied up an elderly woman in her house overnight, threatened to kill her, and cut all her phone lines before leaving with money and jewelry stolen from her safe.

As a captain of the Luchese family, Lubrano is able to exert control over individuals who routinely engage in this kind of violence.  If released, Lubrano is likely to continue to reach out to similarly violent individuals in order to further the criminal interests of the Luchese family.  Lubrano also has a history of arrests and convictions for assault and weapons possession and was convicted of robbery in the second degree in 1997.

B.   <u>Joseph Lubrano is a Substantial Flight Risk</u>

Between May 18, 2010 and September 11, 2010, Lubrano was a fugitive from justice.  Lubrano was well-aware that federal agents were seeking his arrest on federal charges but actively sought to avoid capture for almost four months.  On May 18, 2010, federal agents attempted to locate Lubrano at his home and at the social club referenced above.  Agents were informed by Lubrano's mother that she did not know where to locate Lubrano.

On or about May 18, 2010, a member of the government received a telephone call from an individual purporting to be an attorney.  This individual informed the government that Joseph Lubrano wanted to surrender in two weeks, when her father, Joseph Lubrano's lawyer, returned to New York from a trip abroad.  This individual was asked to inform Joseph Lubrano that unless he surrendered immediately, he was considered a fugitive from justice and federal agents would continue in their efforts to locate him.

On or about June 1, 2010, federal agents received a telephone call from the attorney purporting to represent Joseph Lubrano (the father of the individual who called previously), and they were informed by this attorney that Joseph Lubrano would surrender in two days.  However, in a subsequent phone call from that attorney, agents were informed that Lubrano could not be located and would not surrender.

Between May 18, 2010 and September 11, 2010, federal agents continued their efforts to locate Lubrano.  They surveilled the area of his social club and spoke to witnesses, including the landlord of the social club, the manager of an apartment building where Lubrano has lived and an individual who identified himself as John Watson, who had been observed in the past with Lubrano outside the social club.  Based on information provided by witnesses and confidential sources, and based on their own surveillance of Watson, agents determined that Watson was helping Lubrano evade law enforcement detection.[4]  Ultimately, agents were able to locate Lubrano in his girlfriend's apartment on September 11, 2010, shortly after Watson left the apartment.

---

[4]   For additional details on Watson's role in assisting Lubrano, please see the complaint in support of Watson's arrest for harboring a fugitive, attached as Exhibit A.

Thus, Lubrano used individuals such as Watson and his girlfriend to help him evade law enforcement's efforts to locate him.  The fact that he was able to do so for four months demonstrates that he is a serious flight risk, and has the ability to flee again were he to be released on bond.  He faces a Guidelines range of 135 to 168 months' imprisonment on the charges contained in the superseding indictment, which provides an additional incentive to flee.  For all of these reasons, the government respectfully submits that he poses both a danger to the community and a serious flight risk.

## IV.  <u>Electronic Monitoring is Not Sufficient</u>

There are no less restrictive factors short of detention that are sufficient to ensure the safety of the community in this case.  While electronic monitoring is appropriate in certain cases, it is not sufficient here to safeguard the community from these dangerous defendants.  The Second Circuit has held that because home detention and electronic monitoring easily can be circumvented, such bail conditions are inadequate safeguards against defendants deemed dangerous for purposes of the Bail Reform Act.  <u>See</u> <u>United States v. Millan</u>, 4 F.3d 1039, 1049 (2d Cir. 1993) ("Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills.  If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that they will obey the conditions.")(internal quotation marks and citations omitted); <u>United States v. Orena</u>, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  <u>See</u>, <u>e.g.</u>, <u>United States v. Cantarella</u>, 2002 WL 31946862, *3-4 (E.D.N.Y. 2002)(Garaufis, J.)(adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); <u>United States v. Agnello</u>, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gershon, J.) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); <u>United States v. Masotto</u>, 811 F. Supp. 878, 884 (E.D.N.Y. 1993)(rejecting bail because "the Second Circuit appears to be saying to us that in

the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

       The assumption criticized as faulty in the above cases is that home confinement and electronic monitoring are adequate safeguards against dangerous defendants.  In Orena, 986 F.2d at 632-33, the Second Circuit explained why no such safeguard is possible:

> Safety of the community will be assured only if the government provides trustworthy, trained staff to carry out the extensive monitoring of homes, telephones, and travel that would be necessary to ensure compliance with the conditions of bail.  If staff were not provided, protection of the community would be left largely to the word of [the defendant] that he will obey the conditions. We find nothing in the Bail Reform Act that requires the government to staff home detention centers or allow dangerous defendants to be at large based upon their promise not to violate conditions of bail.

V.   Conclusion

       For all of the foregoing reasons, the Court should enter a permanent order of detention for the defendant Joseph Lubrano.

                      Respectfully submitted,

                      LORETTA E.LYNCH
                      United States Attorney

              By: _____/s/_____
                  Rachel J. Nash
                  Assistant U.S. Attorney
                  (718) 254-6072

cc:  Clerk of Court (by ECF)